**UNITED STATES of America ex rel. Robert DeMARY, Petitioner,**

v.

**Frank J. PATE, Warden, Respondent.**

**No. 67 C 548.**

United States District Court
N. D. Illinois, E. D.

Oct. 31, 1967.

Raymond J. Smith, Chicago, Ill., for petitioner.

William G. Clark, Atty. Gen., of Illinois, Chicago, Ill., for respondent.

## MEMORANDUM OPINION

DECKER, District Judge.

After holding an evidentiary hearing upon a petition for habeas corpus filed by a state court prisoner presently confined at the Illinois State Penitentiary, I am confronted with the question of whether the writ should be granted because of inadequate representation of the petitioner at his trial.

The ten to fifteen year sentence which petitioner DeMary has been serving was imposed on July 3, 1963, by the Criminal Court of Cook County following a jury trial upon a charge of burglary. DeMary did not appeal his conviction but subsequently filed a petition in the trial court under the Illinois Post-Conviction Hearing Act which was dismissed on the State's motion without a hearing. In his post-conviction petition, DeMary alleged that he had not been provided adequate representation of counsel on his trial, as guaranteed by the due process clause of the Fourteenth Amendment, and particularly alleged that neither his court-appointed public defender nor any other public defender ever came to the jail to consult with him as to the nature of the charge against him or to see if he had any witnesses to appear in his behalf. In such petition, DeMary also alleged that his co-defendant Frank Wilson was available as a witness at the time of DeMary's trial and furnished a supporting affidavit to this effect.

The dismissal of this petition without a hearing was affirmed by the Supreme Court of Illinois, People v. DeMary, 37 Ill.2d 364, 227 N.E.2d 361 (1967) (Schaefer, J., dissenting).

In the petition filed here for a writ of habeas corpus, DeMary makes substantially the same allegations as he set forth in his post-conviction petition.

Under the provisions of 28 U.S.C. § 2243, I considered it mandatory to grant petitioner's request for an evidentiary hearing, which I limited to two factual questions: (1) Did court-appointed trial counsel confer adequately with petitioner in advance of his trial? (2) Was Frank Wilson an available defense witness at petitioner's trial, and what would have been the nature and effect of his testimony?

On the basis of such hearing, and after consideration of all the documents submitted, including the transcript of the trial, I have determined that the petition must be granted for the reasons which I will now state.

The details of the burglary for which petitioner was tried and convicted are sufficiently set forth in the Supreme Court opinion, 37 Ill.2d at 365–366, 227 N.E.2d 361. The following additional facts were developed at the evidentiary hearing or obtained from the transcript of the trial court testimony, which I have carefully reviewed.

DeMary's arrest for the October 10, 1961, burglary occurred on October 23, 1961. After being taken to the police station, according to police testimony, he gave an oral statement admitting that he and his brother-in-law, Frank Wilson, the co-defendant, participated in the burglary. After this statement was reduced to writing, DeMary refused to sign it. After being released on bond, DeMary did not appear at his arraignment, and the case against him was stricken with leave to reinstate. DeMary claims that at the time of his arraignment he was ill in the hospital. His co-defendant Wilson was thereupon tried and acquitted.

On March 5, 1963, DeMary presented himself to the police, and the case against him was reinstated the following day. After his formal plea of not guilty was

taken, the case was then assigned to Judge Harewood, and an assistant public defender, Justine Knipper, was designated to represent DeMary. She appeared with him on the same date, March 6, before Judge Harewood, who continued the case to March 27, 1963, with directions to the prosecution to furnish DeMary's counsel with any statements in their possession.

The case was called again on March 27, April 15, April 25, May 9, and May 21, and was continued each time. On the second of these dates, Attorney Knipper was furnished with a copy of the alleged confession, and on April 25 she answered "ready for trial." On June 17, Miss Knipper again answered "ready for trial," and the trial was held on the following two days.

From Attorney Knipper's own testimony, it appears that she only consulted with DeMary on four occasions prior to appearing for trial. These four dates were March 6, March 27, April 15 and April 25. All of these "consultations" were in the "bull pen," the detention area for prisoners directly behind the courtroom. There were no conversations on the continuance dates of May 9 and May 21.

On March 6 there was only a brief interview at which time Miss Knipper found out that there was a possibility that DeMary or his family would be able to obtain private counsel, and on this occasion he stated to her that he did not commit the burglary and that "there was a possibility of an alibi." Miss Knipper at that time made a notation "to check the alibi for the day of the burglary." Thereafter she did no checking and she had no further conversation with DeMary relative to the alibi defense.

According to her own testimony, Miss Knipper spoke with DeMary on March 27 only to tell him that the case would be continued. The next conversation on April 15 occurred after Miss Knipper had read the alleged confession. At this time, according to her testimony, she told DeMary that the case would be difficult for him if Clifton Sloan, the identifica-

tion witness who was mentioned in the confession, was to testify for the prosecution.

On April 25 Miss Knipper apparently only spoke to DeMary to indicate that the case was going to be continued once again. There was no communication of any kind between DeMary and his attorney between May 21 and June 17.

DeMary testified, without contradiction, that his attorney never visited him at the County Jail to discuss his case with him and that no investigator or other employee of the public defender's office ever visited him there or in the bull pen. Although it was the usual practice of the public defender's office to have the client fill out a confidential questionnaire giving the client's version of the facts of the case and mentioning any possible witnesses to be called for the defense, no such questionnaire was ever presented to DeMary for him to fill out prior to the trial. Similarly, the financial affidavit which indicates a potential client's need for free legal services was not filled out by DeMary.

At sometime during his jail stay, DeMary, with the assistance of some of his jailmates, prepared a *pro se* petition which he captioned, "Motion to Suppress Evidence," in which he asserted that the unsigned statement allegedly given by him to the police in October of 1961 was not made by him or known of by him.

This *pro se* motion was submitted to the court by Miss Knipper on June 17, 1963, and at the request of the State, the case was then continued to the next day for trial. Apparently no discussion took place on this date between DeMary and his attorney as to possible witnesses or as to any plan of defense. It was in this situation that DeMary came to Judge Harewood's courtroom on June 18, to be tried.

On the morning of June 18 petitioner, upon entering court, hurriedly told Miss Knipper that his wife could testify as to an incident on June 9 in which the State's witness Sloan had asked Frank Wilson to bring him to the home of petitioner's wife, and that Sloan had then offered

to alter his testimony against DeMary in return for the payment of some money to him. In this conversation DeMary told his counsel that both Frank Wilson and James Wilson could testify as to this alleged visit, but that neither of them was in court.

After receiving this information, Miss Knipper requested a continuance of one day to contact these witnesses. In arguing for a continuance, she stated to the court, "[N]ow I have two witnesses I never heard of before this morning." These two witnesses apparently unknown to Miss Knipper previously were the Wilson brothers. The court denied the continuance on the ground that there had been prior continuances, and the case proceeded to trial.

At this time DeMary began asserting to the court that he had not had a chance to talk to his lawyer and that he did not consider himself competently represented by the public defender and stated that he would not participate in or assist in his defense in the trial and requested the court to appoint other counsel for him. These assertions, in one form or another, continued throughout the trial. DeMary's motions for appointment of different counsel and later on for a change of venue were denied.

The crucial evidence at the trial consisted of the identification of DeMary at the scene by the witness Clifton Sloan and DeMary's confession. The record is confused as to what occurred in connection with the *pro se* motion to suppress the confession. Miss Knipper apparently prepared another motion of her own which DeMary refused to sign. The State indicated that no hearing would be required because no "physical evidence" was going to be produced. This indication by the State, although clearly not directed to the confession, seemed to withdraw all further attention from DeMary's *pro se* motion as well as the substitute motion prepared by Miss Knipper. In any event, no hearing was ever held on the motion to suppress.

On the morning of June 19, DeMary's alleged confession was introduced into evidence over Miss Knipper's objection. The only ground for objection offered was that the confession "wasn't freely and voluntarily given." Beyond this assertion, there is no indication that Miss Knipper had any knowledge of the circumstances in which the confession was given.

The prosecution produced five witnesses, including Clifton Sloan, who were cross-examined by Miss Knipper with the apparent purpose of finding points of weakness in their testimony. No such points seemed to be revealed, and it even appeared that her cross-examination of Sloan brought out more damaging details regarding DeMary's participation in the burglary than the State's direct examination brought out.

The only witnesses called by DeMary were his wife and his brother-in-law, James Wilson. Their testimony was limited to the alleged visit of Sloan to Mrs. DeMary.

The first attempt made by Miss Knipper to contact or locate the acquitted co-defendant Frank Wilson occurred on June 18, when she caused a subpoena to be issued for his appearance after hearing that Wilson was allegedly involved in taking the witness Sloan to the DeMary residence. The apparent purpose of this subpoena was to secure Wilson's attendance only for the purpose of giving this testimony, and there was no discussion as to the fact that he was a possible alibi witness. This subpoena was not served, and although the allegation was made that Wilson had been present during a portion of the trial proceedings, this was denied by Wilson.

Whether the witness was present or not, it is clear from her own testimony that Miss Knipper did not attempt to speak to him at any time in the courtroom. It is also clear from the affidavit furnished by Frank Wilson, and also from his testimony before this court, that he was available and willing to testify for DeMary at the time of the trial regarding both the whereabouts of DeMary and himself on the night of the burglary and the offer by Sloan to ac-

cept money in return for altering his testimony against DeMary. Miss Knipper furnished no explanation as to why she had failed to contact this witness or to check the transcript of the testimony at his own trial.

The jury returned a guilty verdict upon which the court entered judgment. After sentence was imposed, Miss Knipper moved for a free transcript for DeMary which was allowed. She did not advise DeMary of his right to appeal, and no appeal was ever taken.

The foregoing facts emerge from the evidence without any serious contradiction. The question presented by these facts is whether DeMary's rights under the Fourteenth Amendment were violated on the basis that he did not have the assistance of counsel for his defense.

 I recognize at the outset that the Constitution does not guarantee the assistance of perfect counsel, if such exist, and that the widest latitude necessarily must be given to the exercise of the attorney's honest judgment and discretion in the conduct of a case. It is equally clear that the amount of time and effort in preparing for trial is only one factor to be taken into consideration in assessing the effective assistance of counsel.

The stringency of the constitutional test of inadequacy is set forth in the frequently cited case of United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), where the Court said:

"Moreover, time consumed in oral discussion and legal research is not the crucial test of the effectiveness of the assistance of counsel. The proof of the efficiency of such assistance lies in the character of the resultant proceedings, and unless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice as grounds for the issuance of a writ of habeas corpus * * *."

These general rules are helpful only to the extent of providing guidelines for a particular case. In one such case, Turner v. State of Maryland, 303 F.2d 507 (4th Cir. 1962), the court was presented with the same problem which confronts me. A state court prisoner filed his petition for habeas corpus on the ground that he had been denied the effective assistance of counsel. The District Court dismissed the petition. The Court of Appeals returned the case to the District Court for an evidentiary hearing. In its initial opinion, the Court of Appeals held that a prima facie case of denial of effective assistance of counsel was made out by allegations that:

"the appointed lawyer made no attempt to familiarize himself with the charges against the petitioner and did absolutely nothing to learn his version of the facts to enable him to conduct the defense; also, that the lawyer did not in any way seek to protect him at the trial or preserve his right of appeal or even inform him of such right to appeal." 303 F.2d at 511.

The court also made the following statement:

"Pro forma entry of an appearance without study or preparation for useful participation in the trial is not a satisfaction of the constitutional rights of the accused." Id.

The court ordered a hearing to be held on the habeas corpus petition, and it was later found in the District Court that the petitioner had not proven that the representation he had received was constitutionally inadequate. The court found that although the appointed attorney delayed considerably before briefly consulting his client about the case, the attorney did undertake an investigation of the case and formulate a plan of defense. Also, there was no inadequacy of representation evident during the trial itself. The District Court made the following observation:

"Counsel should consult with his client a sufficient length of time before the trial to enable counsel to learn the facts, interview any witnesses whose

testimony might be helpful, consider the wisest course of action, and explain this to the client. Usually the failure to do so until less than half an hour before the time set for the trial would amount to inadequate representation." 206 F.Supp. 111, 114 (D.Md.1962).

The District Court's denial of the petition was affirmed on appeal. The Court of Appeals agreed with the lower court that the attorney had made "an effort before trial to secure information necessary to [the] defense." The court also observed that the hearing in the District Court demonstrated beyond doubt that the accused had had no useful information to convey to his attorney before trial to help in the defense of the case. This was, of course, the same thing as saying that the petitioner had not shown any actual prejudice as a result of the attorney's questionable conduct of the defense. The Court of Appeals went on to make the following statements, which are of plain relevance to the present case:

"A sense of professional responsibility should have suggested to the lawyer that the omission to communicate with his client during the two weeks available before trial not only constituted a deplorable disregard of the client's feelings, but involved the risk of overlooking significant information which the client might have in his possession or be able to point to. Normally, in the absence of clear proof that no prejudice resulted, we should be obliged to treat the lawyer's representation as inadequate and the trial as falling short of the standards of due process guaranteed by the Fourteenth Amendment.

\* \* \* \* \* \*

"Whether a lawyer is employed by a prosperous defendant at a handsome fee or serves an indigent without compensation in the discharge of the duty resting upon him as an officer of the court, the canons of our profession require his 'entire devotion to the interest of the client, warm zeal in the maintenance and defense of his rights and the exertion of his utmost learn-

ing and ability.' American Bar Association, Canons of Professional Ethics, Canon 15." 318 F.2d 852, 853–854 (4th Cir. 1963).

■ Tested by these standards, the representation of DeMary by his appointed counsel fell markedly short of the constitutional requirements. As the record now stands, it shows that there was a total absence of any meaningful consultation and investigation by counsel or by any other representative of the public defender's office on behalf of DeMary. From the evidence which I heard, it clearly appeared that DeMary's court-appointed counsel failed to attempt to contact before trial the person who obviously could have been the key witness for the defense. That person was available to testify favorably to DeMary, and that person's testimony might have made a difference in the outcome of the case. Counsel's failure to attempt to contact this person was the result of a lack of effort prior to the commencement of the trial to become familiar with the facts of the case, with DeMary's version of the events in question, and with the possible elements of a defense. In short, prejudicial error resulted at trial from a *total* lack of any reasonably conscientious effort directed toward the preparation of a defense. Thus, in this case there was not that effective assistance of counsel and that essential integrity of a trial which due process demands in all cases.

Petitioner DeMary has now demonstrated what he charged to be true in his post-conviction petition upon which he was denied a hearing. His claim of inadequate representation was made at the earliest opportunity when he appeared for trial—it was not made as an after-thought in the penitentiary following an unsuccessful trial.

■ The Supreme Court of Illinois in People v. Ashley, 34 Ill.2d 402, 216 N.E. 2d 126 (1966), made this observation which directly applies here:

"Appointed counsel undoubtedly have the duty to investigate and prepare to the extent reasonably necessary to ade-

quately present their client's cause." Id. at 412, 216 N.E.2d at 131.

This duty was not discharged in this case, and the petitioner has demonstrated that he was substantially prejudiced as a result thereof.

For the reasons set forth, the petitioner is entitled either to a new trial, or in default of such trial within a reasonable time, to be discharged. The writ will be granted with execution suspended for a period of thirty days to permit the State to take appropriate action to reinstate the cause for trial. In the event such action is not taken within said thirty day period, petitioner will be discharged.